UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERMAINE D. HUNTER,

Plaintiff,

v.

KENT CUSTIN, *et al.*,

Defendants.
______________________________/

Case No. 1:15-cv-593

Hon. Gordon J. Quist

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on defendants Gilkie, Barnett, Thoma, Smith, Dusenbery, Rykse, Lincoln and Meagher's motion for summary judgment (ECF No. 133).

**I. Background**

**A. Plaintiff's complaint**

Plaintiff's complaint named 13 defendants. Eight defendants remain: Deputy Warden Barbara Meagher; Inspector Kimberly Dusenbery; Sgt. Shawn Rykse (sometimes referred to by plaintiff as "Rykses"); Resident Unit Supervisor (RUS) Gerald Gilkie; and Corrections Officers Dennis Barnett, William Thoma, Carl Smith, and Robert Lincoln. Plaintiff's claims involve incidents which allegedly occurred while he was incarcerated at the Richard A. Handlon Correctional Facility (MTU). Plaintiff alleged that various defendants took his typewriter, assaulted him, and retaliated against him. Plaintiff's relevant allegations were summarized previously as follows:

A. Confiscation of Typewriter

According to the complaint, Plaintiff was transferred to MTU from Saginaw Correctional Facility (SRF) on January 12, 2012. The day before his transfer, an officer inspected Plaintiff's property (including his typewriter), and confirmed that it was not contraband. The next day, Officer Rievert, an SRF official against whom Plaintiff had filed many grievances, told Plaintiff, "Tell Thoma, I send my regards." (Compl., docket #1, Page ID#7.) When Plaintiff arrived at MTU, the property room officer, Defendant Thoma, confiscated Plaintiff's typewriter, stating, "It looks like another prisoner put Plaintiff's number in it with a pin." (*Id.*) Plaintiff explained that he obtained the typewriter while he was at a different facility, and that MDOC officials put his number on it. Thoma refused to listen, and refused to issue any documentation indicating that the typewriter had been confiscated, such as a Contraband Removal Record, a misconduct report, or a Notice of Intent to Conduct an Administrative Hearing (NOI). Thoma stated that he would send the appropriate documents to another officer, but he never did.

Several days later, when Plaintiff asked about his typewriter, ARUS Gilkie stated that he did not know about it. The next day, Plaintiff asked Thoma to speak with Gilkie about the typewriter, but Thoma refused to do so. On January 26, Gilkie denied Plaintiff's requests for access to the typewriter, stating, "I don't have any paperwork to do anything." (*Id.* at Page ID#8.) Plaintiff told Gilkie that he would file a grievance about the issue. Gilkie "reacted vindictively" and denied Plaintiff's request to contact Thoma about the typewriter. (*Id.* at Page ID#9.) On January 30, Plaintiff filed a grievance against Thoma and Gilkie, claiming that they retaliated against him and conspired to improperly confiscate his typewriter.

Plaintiff asserts that Defendants Meagher and Heffelbower allowed Thoma to investigate this grievance, in violation of MDOC policy. Thoma allegedly confronted Plaintiff and admitted that he "unlawfully" confiscated the typewriter at the "behest" of Officer Rievert, and that he intentionally failed to issue any documentation about it. (*Id.*) Thoma offered to return the typewriter if Plaintiff would agree to "sign off" on the grievance. (*Id.*) Plaintiff refused to do so.

On February 7, Thoma responded to the grievance and claimed that the typewriter was being held in the property room until Plaintiff could provide a proof of purchase. He also indicated that he was resending a NOI to ARUS Gilkie. That same day, Officers Barnett and Thoma allegedly summoned Plaintiff to the officer's desk to review the NOI and to conduct an administrative hearing. Plaintiff refused to participate in a hearing because he had not received sufficient notice, Barnett did not have possession of the typewriter, and Barnett was not authorized to conduct an administrative hearing, per MDOC policy. Nevertheless, Barnett allegedly prepared a report in which he recommended that the typewriter be destroyed. (*See* Notice of Intent to Conduct an Administrative Hearing, App'x C to Compl., docket #1-1, Page ID#46.)

The next day, Plaintiff complained about the hearing process to ARUS Gilkie, who confirmed that he had authorized Barnett to conduct a hearing. Plaintiff indicated that he intended to file a grievance about the issue. Gilkie "reacted vindictively," tore up the report prepared by Officer Barnett, and fabricated a new report which recommended that the typewriter be sent to Plaintiff's home, at Plaintiff's expense. (Compl., Page ID#11.) Plaintiff filed a grievance complaining that Gilkie, Barnett and Thoma were conspiring to retaliate against him.

Officer Thoma responded to the grievance filed against him and Gilkie on January 30, and claimed that the typewriter was being held in the property room because Plaintiff had not provided proof that he owned it. Sergeant Foldie investigated the grievance and told Plaintiff that his typewriter was properly numbered and that she could not find any alterations on it. She advised Plaintiff to appeal his grievance to the next step. Plaintiff did so, but Warden Prelesnik denied the appeal, acknowledging that "staff may have been lengthy in processing paperwork" and that "staff involved in the grievance answered the grievance," but finding that "[t]he typewriter does appear to be altered and you cannot show proof of ownership." (Second Step Grievance Response, App'x B to Compl., docket #1-1, Page ID#43.) Plaintiff appealed this decision to step III of the process, but his appeal was denied by Defendant Custin on June 14, 2012.

RUM Lauer responded to the grievance filed on February 8. He determined that ARUS Gilkie made his decision at the administrative hearing without actually viewing the typewriter; instead, Gilkie relied on the statement of the property room officer. (*See* Step I Grievance Response, App'x E to Compl., docket #1-1, Page ID#51.) However, Lauer looked at the typewriter and determined that the property room officers "were correct about the numbers being sanded off and renumbered." (*Id.*) Lauer also determined that Officer Barnett did not conduct the administrative hearing; instead, Barnett reviewed the NOI with Plaintiff. Lauer concluded that the typewriter should not be returned to Plaintiff because he had not shown proof of ownership. (*Id.*) Plaintiff appealed this decision, but Warden Prelesnik denied the appeal, concluding that the typewriter appeared to be altered and that Plaintiff could not show proof of ownership. Plaintiff appealed this decision to step III of the process, and his appeal was denied by Defendant Custin on June 25, 2012.

While his grievance appeals were pending, Plaintiff was transferred to Ionia Correctional Facility (ICF) on March 23, 2012. Upon arrival at ICF, the property room officer told Plaintiff that he had been contacted by Sgt. Foldie about the typewriter. Foldie spoke with the RUM at ICF, who investigated Plaintiff's ownership of the typewriter and was able to confirm that Plaintiff lawfully acquired the typewriter while he was incarcerated at a different facility. Prison officials at ICF subsequently returned the typewriter to Plaintiff.

B. Harassment

"[A]lmost immediately" after Plaintiff filed his first grievance at MTU about the confiscation of his typewriter, Officer Lincoln began to harass Plaintiff by conducting random patdown searches. (Compl., Page ID#14.) On February 6, 2012, as Plaintiff was on his way to dinner, Officer Lincoln confronted him and said, "Hunter, get your ass over here - asshole, shakedown." (*Id.* at Page ID#15.) Plaintiff complied, but the search lasted for 15 minutes. During that time, Lincoln spoke to Plaintiff using "demeaning language" and engaged in "prolonged rubbing and fondling of Plaintiff's genitals." (*Id.*) Plaintiff threatened to file a grievance against him for sexual assault, and Lincoln "reacted vindictively by getting up in Plaintiff's face with his first clenched, as if he was about to strike Plaintiff," and stating, "I got a hard on for you anyways asshole – what you wanna do, you wanna see me. I'll beat your ass." (*Id.*)

On February 12, when Plaintiff was walking to the recreation yard, Lincoln said to him, "Hey you asshole, get your ass over here and give me . . . your I.D." (*Id.*) Plaintiff told him that his name was not "asshole" and said, "Talk to me with respect. I'm not one of these little kids around here." (*Id.* at Page ID#16.) Lincoln replied, "I didn't know your name, so I called you asshole, what you gonna do, file another grievance." (*Id.*) Plaintiff shook his head. Lincoln then "[got] up in Plaintiff's face with his fist clenched, as if he was about to strike Plaintiff," and he stated, "What you wanna do. You wanna see me or something." (*Id.*) Plaintiff turned and walked away. As he did so, Lincoln raised his hands in the air and said, "I didn't think so. I knew you didn't wanna do shit. That's right, take your ass back to your unit." (*Id.*) Later that day, Plaintiff filed a grievance against Lincoln.

The next day, Plaintiff told ARUS Gilkie about Lincoln's "ongoing harassment" and indicated his fear that Lincoln would assault him. Gilkie refused to do anything about it at the time, but told Plaintiff to file a grievance on Lincoln. (*Id.* at Page ID#17.)

On February 14, as Plaintiff was walking to the recreation yard, Lincoln singled him out and demanded that he submit to a pat-down search. During the search, Lincoln put his hands between Plaintiff's legs and thrust it upward, deliberately slamming it into Plaintiff's genitals. Plaintiff exclaimed and bent forward in pain. Lincoln told him to turn around and keep his arms up. The search lasted for 12 minutes. After the search ended, Plaintiff decided to return to his cell because he was feeling "sharp, severe . . . pain" in his genitals and lower abdomen. (*Id.* at Page ID#18.) Sometime later, he noticed blood in his urine. He sought medical attention and was given Motrin tablets for the pain. Plaintiff subsequently filed a grievance about Lincoln's actions.

On February 15, Plaintiff told Officer Rykses about Officer Lincoln's conduct and asked Rykses to check the video footage, ostensibly to confirm Plaintiff's concerns. Rykses indicated that he was aware of many prisoner

complaints about Officer Lincoln's sexually-abusive searches, but insisted that Plaintiff "sign off" on his grievances against Lincoln so that Rykses could speak to Lincoln. (Id.) Plaintiff refused to do so. Rykses became "visibly angry" and failed to document Plaintiff's complaints of sexual abuse or report them to supervisory staff.

On February 22, Plaintiff was called to Inspector Dusenbery's office to be interviewed about the conduct by Lincoln on February 14, which Plaintiff had described in his grievance. On the way to Dusenbery's office, Plaintiff passed by Deputy Warden Meagher and reiterated his concerns about "ongoing abusive conduct" by Officer Lincoln. Meagher promised to look into them, but Plaintiff alleges that Meagher never did. Inspector Dusenbery subsequently met with Plaintiff and told him, "I caution you. Be careful!" (Id. at Page ID#19.) Dusenbery tried to have Plaintiff accept the February 14 incident as "just a shake down [that] he didn't like." (*Id.*) Plaintiff refused to do so. Dusenbery did not look at the security video footage of the incident and "threatened" the other prisoner who observed it. (*Id.* at Page ID#20.) Dusenbery also failed to report the incident to the police as required by MDOC policy. Plaintiff claims that she wanted to protect Lincoln from disciplinary action. Plaintiff filed a grievance against her for retaliating against him and for threatening and intimidating him to sign off on the grievance against Lincoln.

On February 27, as Plaintiff entered the field house building, Officer Lincoln "singled Plaintiff out" to Officer Smith as the prisoner responsible for the sexual assault investigation. Thereafter, Smith began "stalking" Plaintiff. (*Id.*) When the field house closed, Smith followed Plaintiff back to his housing unit. Smith kicked the door of Plaintiff's cell open, "approached Plaintiff in a threatening and intimidating manner" and "forcibly took charge" of Plaintiff's television. (*Id.* at Page ID#21.) Plaintiff stated that he did not feel comfortable with Smith in the room. Smith told him, "You don't feel comfortable, good. Welcome to MTU." (*Id.*) Plaintiff claims that, as a yard officer, Smith did not have authorization to be in Plaintiff's cell. Plaintiff filed a grievance against Smith for retaliation and for threatening and intimidating conduct.

On March 9, Sergeant Rykses summoned Plaintiff to the officers' desk and "aggressively confronted" him about the grievance against Officer Smith. (*Id.*) Rykses asked Plaintiff to "sign off" on the grievance, but Plaintiff refused. (*Id.*) Rykses then told three other officers nearby, "That dickhead . . . is filing all these grievances around here, and not signing off." (*Id.* at Page ID#22.) The next day, Plaintiff filed a grievance against Rykses.

On March 15, while Plaintiff was in his cell, Officer Smith entered Plaintiff's unit and came to the doorway of Plaintiff's cell on four occasions to "mean mug" him for a few minutes at a time. (*Id.*) Plaintiff went to Gilkie and told him about it. Gilkie stated that Smith was not supposed to be in Plaintiff's unit, but

that Gilkie would deal with it. (*Id.*) That evening, however, Smith came to Plaintiff's cell again and told him, "We got you." (*Id.* at Page ID#23.) Ten minutes later, Smith summoned Plaintiff to the officers' desk. As soon as Plaintiff left his cell, he saw Officer Lincoln standing in the hallway, in Plaintiff's path. Lincoln stated, "Shakedown asshole." (*Id.*) Lincoln then put his hands between Plaintiff's thighs, grabbed his genitals in a "sexually aggressive" manner, and squeezed them, causing severe pain. (*Id.*) While Lincoln continued to hold Plaintiff's genitals in his hand, he stated, "Whose are these, because you don't have any little bitch. Your pussy-ass would rather file a grievance." (*Id.*) The search lasted for approximately 15 minutes. After the incident, Petitioner filed an "emergency" grievance about it with Inspector Dusenbery. Dusenbery allegedly refused or failed to process the grievance. Instead, she turned it over to ARUS Gilkie.

When Gilkie returned to work on March 19, he summoned Plaintiff to his office. He confronted Plaintiff about the grievance against Lincoln, stating, "What is this. You got muthafucka's confronting me about what[']s going on in my unit, like I condone this shit. . . . You could've gave me a heads up first." (*Id.* at Page ID#24.) Gilkie told him to "take this grievance and get . . . out of my office now." (*Id.*) Later that day, Plaintiff refiled his "emergency" grievance with Grievance Coordinator Heffelbower. (*Id.*) He also filed a grievance against Inspector Dusenbery and ARUS Gilkie for "corruption," "retaliation," and "conspiracy to impede the administrative grievance process[.]" (*Id.* at Page ID#25.) Heffelbower allegedly refused and/or failed to process these grievances.

On March 21, a prisoner who was mentioned in one of Plaintiff's grievances as a witness to the March 15 assault by Lincoln was subjected to a "pretextual" cell search and transferred to another housing unit. (*Id.*)

On March 22, ARUS Gilkie came to Plaintiff's cell, gave him six "unrelated Step 2 grievances," and told him, "You just keep it coming don't you. One grievance after the other. That[']s why SRF got rid of you. . . . I'm gone [sic] do you, me and everybody else a favor." (*Id.*) The following day, Plaintiff was transferred to ICF. Plaintiff asserts that he was on a list to be transferred "down state" to "Ryan, Mound and/or Thumb Correctional Facility" at the time. (*Id.* at Page ID#26.) However, Dusenbery, Gilkie, Lincoln and Smith allegedly persuaded Shaffer, Deputy Warden Meagher, and RUM Lauer to transfer Plaintiff to ICF. Plaintiff subsequently filed a grievance against Defendants Prelesnik, Meagher, Shaffer, Lauer, and Gilkie for transferring Plaintiff in retaliation for filing grievances.

On March 27, ARUS Snyder summoned Plaintiff to her office to ask him about what she referred to as "the suspicious circumstances surrounding his transfer to ICF, without proper authorization." (*Id.* at Page ID##26-27.) According to Snyder, officials at MTU failed to prepare a transfer screen or a transfer order, as required by MDOC policy.

> Thereafter, Plaintiff sent several inquiries to Grievance Coordinator Heffelbower about the two grievances that he filed on March 19 against Defendants Dusenbery, Gilkie, Lincoln, and Smith. Heffelbower did not respond to his inquiries.
>
> Plaintiff contends that he suffered emotional distress as a result of the foregoing events. In addition, the physical assaults by Officer Lincoln caused him to suffer significant pain in his genitals and lower abdomen, some of which is ongoing. Plaintiff claims that Defendants have violated his rights under the constitution and state law.

Opinion (ECF No. 9, PageID.139-147) (footnotes omitted). While plaintiff was transferred to Ionia Correctional Facility (ICF) on March 23, 2012 (*see* Compl. at PageID.25), his complaint refers to matters which occurred after that date.

## II. Legal Standards

### A. Plaintiff's § 1983 claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem*, Ohio, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983. Here, plaintiff has alleged that defendants retaliated against him in violation of his First Amendment rights and violated his Eighth Amendment rights.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged

in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. The Supreme Court has held that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson*, 503 U.S. at 8.

To demonstrate the objective component, the plaintiff must demonstrate that he has been deprived of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (quoting *Rhodes*, 452 U.S. at 346). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Hudson*, 503 U.S. at 9 (internal quotation marks omitted). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

**B. Defendants' Motion for summary judgment**

Defendants seek summary judgment on the merits, for lack of exhaustion, and under a theory of qualified immunity. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of

> production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland,* 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. Discussion

### A. Deputy Warden Meagher

On initial screening, the Court concluded that plaintiff stated an Eighth Amendment claim against Deputy Warden Meagher for failing to investigate "[p]laintiff's concerns about Officer Lincoln's abusive conduct." Opinion at PageID.152-153. Meagher seeks summary judgment because she lacked personal involvement in the alleged constitutional violation. Meagher states that her sole involvement in this matter is that she responded to one of plaintiff's grievances, which she reviewed on February 24, 2012. Defendants' Brief (ECF No. 134, PageID.703). *See* Grievance MTU-12-02-00184-017c ("184") (ECF No. 134-3, PageID.762). The grievance at issue involved plaintiff's claim that CO Lincoln assaulted him on February 14, 2012.

*Id.*[1] Plaintiff's contention that Meagher failed to investigate Lincoln on February 22, 2012, arose during Meagher's review of plaintiff's grievance against Lincoln. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See*, *e.g.*, *Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the actual denial of a request to receive medical care). Accordingly, Deputy Warden Meagher should be granted summary judgment and dismissed from this case.

**B. Sgt. Rykse**

On initial screening, the Court concluded that plaintiff alleged an Eighth Amendment claim against Sgt. Rykse for failing to take action in response to plaintiff's concerns about defendant Lincoln, "even though Rykses [sic] was aware of other instances in which Lincoln had assaulted other prisoners." Opinion at PageID.158. Rykse seeks summary judgment because he lacked personal involvement in the alleged constitutional violations. Rykse served as a respondent to Grievance MTU-12-02-0244-17a ("244") (ECF No. 134-3, PageID.757). As discussed, a prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *See Shehee*, 199 F.3d at 300; *Alder*, 73 Fed. Appx. at 841. In addition, plaintiff's contention that Ryske failed to investigate his other claims against Lincoln do not state a cause of action. "[L]iability under § 1983 must be based on active unconstitutional

[1] While defendants refer to Grievance 184, the Court notes that Deputy Warden Meagher also responded to another grievance, Grievance MTU-12-02-0244-17a (ECF No. 134-3, PageID.757).

behavior and cannot be based upon a mere failure to act." *Shehee*, 199 F.3d at 300. Accordingly, Sgt. Rykse should be granted summary judgment and dismissed from this case.

**C. Inspector Dusenbery**

On initial screening, the Court concluded that plaintiff alleged an Eight Amendment "and/or retaliation claim" against Inspector Dusenbery for failing to complete an investigation against defendant Lincoln's alleged assault on February 14, 2012, and refusing to process plaintiff's grievance about Lincoln's alleged assault on March 15, 2012. Opinion at PageID.153.

**1. The February 14, 2012 assault**

Dusenbery seeks summary judgment because she lacked personal involvement in the alleged constitutional violations. Dusenbery states that her sole involvement in this matter is that she served as a respondent to Grievance 184 (ECF No. 134-3, PageID.762). As discussed, a prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *See Shehee*, 199 F.3d at 300; *Alder*, 73 Fed. Appx. at 841. Accordingly, Inspector Dusenbery should be granted summary judgment with respect to this claim.

**2. March 15, 2012 assault**

Dusenberry does not address plaintiff's claim that she refused to process his "emergency" grievance related to the March 15, 2012 incident when defendant Lincoln squeezed his genitals in a "sexually aggressive" manner, causing severe pain. Accordingly, this claim should proceed to trial.

**D. Gilkie, Thoma, Barnett and the typewriter**

On initial screening, the Court concluded that plaintiff alleged a retaliation claim against CO Thoma who "allegedly admitted that he confiscated the typewriter unlawfully at the

request of Officer Rievert, an official whom Plaintiff had filed many grievances against." Opinion at PageID.156.

The Court also concluded that plaintiff stated a claim against RUS Gilkie:

> Defendant Gilkie allegedly denied Plaintiff's request to access his typewriter, denied Plaintiff's request to contact Officer Thoma about the typewriter, improperly permitted Officer Barnett to conduct an administrative hearing regarding Plaintiff's ownership of the typewriter, and then fabricated a hearing report which recommended that the typewriter be sent out of the facility to Plaintiff's home after Plaintiff threatened to file a grievance about Officer Barnett's actions. The foregoing facts suffice to state a retaliation claim against Defendant Gilkie.

Opinion at PageID.156-157.

Finally, the Court allowed plaintiff's "possible retaliation claim" against CO Barnett go forward, even though the Court could not clearly define plaintiff's claim:

> Plaintiff alleges that Officers Barnett and Thoma summoned Plaintiff to the officers' desk in order to conduct an improper administrative hearing regarding the status of the typewriter. Officer Gilkie allegedly authorized Barnett to conduct the hearing, even though Barnett could not do so under MDOC policy. At the hearing, Barnett allegedly determined that the typewriter should be destroyed. Plaintiff contends that Officer Barnett was acting in concert with Officers Thoma and Gilkie to retaliate against Plaintiff. At this stage of the proceedings, the Court finds that Plaintiff has stated a possible retaliation claim against Barnett.

*Id.* at PageID.156.

Defendants' brief sets forth a chronology of how MDOC officials addressed the situation which arose when plaintiff could not prove his ownership of a typewriter which appeared to have altered identification numbers. The chronology is reproduced in pertinent part as follows:

> Michigan Department of Corrections Policy Directive 04.07.112 governs prisoner personal property allowances for the general population prisoners in a Correctional Facility Administration institution. This Policy directive provides that appliances, such as a typewriter, must be purchased from the Standardized property List and must be inscribed with the prisoner's identification number. (Exhibit A, PD, Paragraph T). This policy also provides in paragraph FF that any item believed to be contraband shall be confiscated. In the present matter, upon transfer into the

> facility, upon arriving to the Richard Handlon Correctional Facility (MTU), Defendant Thoma, as required by MDOC, inspected Plaintiff's property. Thoma believed that the prisoner number on the typewriter appeared to have been altered. In accordance with MDOC policy, Thoma did not provide the typewriter to the Plaintiff and requested that the Plaintiff show his paperwork of ownership and Plaintiff informed him that he had the proof in his paperwork. The typewriter was being held in the property room until Plaintiff was able to find proof of purchase. (Exhibit B, Grievance MTU-12-01-00130-007d Step I Response). Plaintiff never provided proof of ownership to the property room, but instead on January 30, 2012, he filed a grievance. Plaintiff was giving [sic] an administrative hearing on the typewriter on February 8, 2012. Still, Plaintiff failed to provide proof of ownership of the typewriter and he refused to participate in the hearing. (Exhibit B, Grievance MTU-12-01-00130-007d Step II Response).
>
> Plaintiff then filed Grievance MTU-12-02-00165-007a, alleging retaliation against Gilkie. Upon investigation of Plaintiff's issues, Rum Lauer inspected the typewriter and found that Thoma was correct and that the numbers had been sanded off and renumbered. Lauer also checked the prisoner's accounting TRUST and found no evidence that Plaintiff had purchased a typewriter (Exhibit B, Grievance MTU-12-02-00165-007a, Step I Response). The typewriter was not returned to Plaintiff because he had not shown ownership according to the policy.
>
> Plaintiff can provide absolutely no evidence to support his suggestion that his typewriter was confiscated in violation of his constitutional rights. Plaintiff's personal belief that his typewriter was withheld in retaliation is insufficient to support a meritorious claim against Defendants Thoma, Gilkie and Barnett. Plaintiff has failed to show that he engaged in protected conduct before he was allegedly denied his typewriter. Plaintiff makes it very clear in his complaint that his typewriter was confiscated upon his initial arrival to MTU. There is no protected conduct in the present matter because the temporary denial of a typewriter to investigate the ownership, predates the filing of any grievances by Plaintiff at MTU. Plaintiff arrived to MTU on January 12, 2012 and on January 13, 2012, he was informed that his typewriter would be held, due to its altered state, pending his ability to prove ownership. Plaintiff filed his initial grievance at MTU, relative to this matter on January 26, 2012, which was received by MDOC on January 31, 2012. Consistent with policy, Plaintiffs typewriter was held temporarily until Plaintiff's was able to provide proof of ownership. There is no evidence to support a claim of retaliation and therefore Plaintiff's claim fails.

Defendants' Brief (ECF No. 134, PageID.693-695).

Courts recognize that retaliation is easy to allege and "is often very difficult to prove with direct evidence." *King v. Zamiara,* 680 F.3d 686, 695 (6th Cir. 2012). Nonetheless,

"bare allegations of malice" are insufficient to state a constitutional claim; rather, a plaintiff must instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken. *Thaddeus-X*, 175 F.3d at 399 (citations omitted). Conclusory allegations of retaliatory motive are insufficient. *See Skinner v. Bolden*, 89 Fed. Appx. 579, 579-80 (6th Cir., Mar. 12, 2004). Instead, plaintiff must, at a minimum, allege a chronology of events from which retaliation can plausibly be inferred. *See Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) ("temporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive") (internal quotation marks omitted).

In *Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018), the Sixth Circuit set forth the following procedure for determining causation on summary judgment motions based on circumstantial evidence:

> Under the third element, "[u]sually, the question of causation is a factual issue to be resolved by a jury and may be satisfied by circumstantial evidence." *Harris v. Bornhorst*, 513 F.3d 503, 519-20 (6th Cir. 2008) (citing *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996)). "Nonetheless, a court may grant summary judgment even in a causation inquiry, where it is warranted." *Hartsel*, 87 F.3d at 803 (citing *Langford v. Lane*, 921 F.2d 677, 683-84 (6th Cir. 1991)). "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Thaddeus-X*, 175 F.3d at 399 (citing *Mount Healthy*, 429 U.S. 274, 97 S. Ct. 568, 50 L.Ed.2d 471). "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id*.

*Maben*, 887 F.3d at 267. "A defendant must make this showing by a preponderance of the evidence. *King v. Zamiara*, 680 F.3d 686, 709 (6th Cir. 2012)." *Id.* at 262 (internal quotation marks omitted). As the Supreme Court recently held, to prevail on a retaliation claim

> It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. Specifically, it must be a

> "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves v. Bartlett*, -- U.S. --, 139 S. Ct. 1715, 1722 (2019).

Defendants have shown that the typewriter was temporarily confiscated to perform an investigation into its ownership history pursuant to MDOC Policy Directives; that the typewriter appeared to have an altered prisoner identification number ("the inmate number appears to be sanded off and [plaintiff's] number placed over the area"); and, that plaintiff did not prove ownership. *See* Notice of Intent (ECF No. 1-1, PageID.46). Notably, plaintiff refused to participate in the hearing regarding his ownership of the typewriter. *See id.* ("While holding hearing Hunter 242663 states he didn't want to participate in the hearing because this is old and all ready grieved"). In this regard, the Warden's Step II response points out that plaintiff received an administrative hearing regarding the ownership of the typewriter on February 8, 2012, that he refused to participate in the hearing, that the typewriter appeared to be altered and that plaintiff cannot prove ownership. *See* Grievance MTU-12-01-00130-007d ("130") (ECF No. 134-3, PageID.741-742). Based on this record, defendants have demonstrated that they would have taken the same action absent the filing of a grievance. *Maben*, 887 F.3d at 267.

Furthermore, plaintiff did not engage in protected conduct prior to the alleged retaliatory act. Plaintiff filed a grievance *after* defendants confiscated the typewriter as contraband.

Accordingly, defendants Gilkie, Thoma and Barnett should be granted summary judgment with respect to the retaliation claim. Because this is plaintiff's only claim against defendants Thoma and Barnett, they should be dismissed from this case.

**E. CO Lincoln**

On initial screening, the Court concluded that "Officer Lincoln physically harassed him on several occasions, ostensibly in reprisal for Plaintiff's grievances . . . The Court concludes that these allegations state a claim under § 1983 against Defendant[] Lincoln." Opinion at PageID.158. While the screening opinion did not list the particular incidents which it considered to be claims under § 1983, plaintiff's complaint raised four incidents which occurred on: February 6, 2012; February 12, 2012; February 14, 2012; and, March 15, 2012.

**1. Plaintiff did not exhaust a grievance for the February 6, 2012 incident**

**a. Exhaustion requirement**

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

**b. MDOC Grievance process**

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

**c. Discussion**

Defendants seek summary judgment for lack of exhaustion on plaintiff's claim against defendant Lincoln which occurred on February 6, 2012. Defendants summarized the claim and lack of exhaustion as follows:

> In the present matter, Plaintiff admits in his complaint, Paragraph 64, that he did not file a grievance at the time of the allegations he alleged to have taken place on February 6, 2012. In his complaint, Plaintiff alleges that on February at approximately 6pm as he was in the food service building, entering dinner,

> Defendant Lincoln confronted him and subjected him to a shakedown. Plaintiff alleges this pat-down search, which took place in a busy area of the food service building, lasted about 15 minutes and allegedly involved prolonged rubbing and fondling. In addition to Plaintiff's admission that he did not file a grievance relative to this incident, a review of Plaintiff MDOC Step III Grievance Report confirms that Plaintiff failed to grieve his alleged February 6, 2012 incident (Exhibit B).

Defendants' Brief (ECF No. 134, PageID.700). Plaintiff does not address his failure to exhaust this claim in his response. Based on the record presented by defendants, defendant Lincoln should be granted summary judgment with respect to plaintiff's February 6, 2012 claim for lack of proper exhaustion. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendants' motion for summary judgment should be granted with respect to this claim.

**2. February 12, 2012**

Plaintiff alleged that on February 12, 2012 at approximately 3:38 p.m., while he was en route to the recreation yard, defendant Lincoln singled out plaintiff, called him an "asshole," and demanded to see his I.D. Compl. at PageID.15. Although plaintiff "passively compiled [sic] with Lincoln's demands," Lincoln inexplicably challenged him to a fist fight. *Id.* at PageID.15-16. During this exchange, Lincoln mentioned the word "grievance" (*i.e.*, telling plaintiff "I didn't know your name, so I called you asshole, what you gonna do, file another grievance."). *Id.* at PageID.16. Sometime after that incident, plaintiff filed a Grievance MTU-12-02-00179-017a ("179") against Lincoln for retaliation, threatening him, and engaging in intimidating conduct. *Id.* at PageID.15-16. Defendants contend that plaintiff cannot meet the causation requirement of a retaliation claim against defendant Lincoln, because he did not engage in protected conduct prior to the incident, *i.e.*, plaintiff's first grievance mentioning Lincoln (Grievance 179) was filed after the February 12, 2012 incident. Defendants' Brief at PageID.695. In this regard, defendants point to ¶ 64 of plaintiff's complaint which notes that he did not file a

grievance against Lincoln prior to the incident. In short, defendants contend that plaintiff did not engage in protected conduct with respect to this retaliation claim against Lincoln.

Plaintiff, however, alleged that Lincoln's actions (including harassment and sexual assaults) occurred after he filed a grievance filed about his typewriter, Grievance 130. Compl. at PageID.14-15. Plaintiff filed this grievance on January 30, 2012, against defendants Thoma and Gilkie. Grievance 130 (ECF No. 134-3, PageID.738). Plaintiff's allegation that Lincoln harassed him and challenged him to a fist fight in retaliation for filing Grievance 130 is unpersuasive. This grievance was filed nearly two weeks before February 12, 2012, incident and had nothing to do with Lincoln. The Court does not accept the proposition that a prisoner can file a grievance and then claim that everything that happens to him in the prison after that date is retaliation. *See, generally*, *Spies v. Voinovich*, 48 Fed. Appx. 520, 524-25 (6th Cir. 2002) ("an inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory") (internal quotation marks omitted).[2] Accordingly, defendant Lincoln is entitled to summary judgment on this claim.

**3. February 14, 2012**

Defendant Lincoln contends that there is no evidence to support this claim, stating as follows:

> Plaintiff's complaint alleges an incident on February 14, 2012 in which he claims that Officer Lincoln stopped him while heading to the yard and ordered a pat-down search. Plaintiff alleges that unreasonable force was used during the search and that as a result he had pain in his genitals and lower abdomen and was urinating blood. Defendant, Inspector Dusenbery investigated Plaintiff's grievance

[2] In this regard, the Court notes plaintiff filed 13 grievances related to his 72-day incarceration at MTU (about one grievance every six days). *See* Compl. at PageID.26; MDOC Step III Grievance Report (ECF No. 134-3, PageID.773-776).

> relative to the February 14, 2012 pat-down search. Plaintiff never reported the alleged incident to any supervisor or other staff and did not seek healthcare following the incident. (Exhibit B, MTU-12-02-00184-017c, Step I Response).

Defendants' Brief at PageID.703. Defendant Lincoln contends that he is entitled to summary judgment because plaintiff has presented no evidence that he either assaulted plaintiff or unnecessarily administered force against plaintiff.

In the response to the plaintiff's Grievance 184, Inspector Dusenbery performed an investigation stating in part that,

> There is no video. This occurred in a busy open yard area. Prisoner claims he did not inform any supervisor or other staff. Prisoner did see Healthcare six days later, informing the nurse, he had been "injured during a shakedown" however, even after a urinalysis, nothing was found. Dr. Gerlach stated when asked by this writer, it was an "impossibility" bloody urine would be caused by the contact described by HUNTER.

Grievance 184 at PageID.762.

Plaintiff has presented medical records which document that he has had a testicular cyst since 2000. Medical Record (ECF No. 140-1, PageID.825). Plaintiff was seen on February 20, 2012, complaining to health care about sharp pains in his scrotum and testicles which he attributed to a shakedown on February 14, 2012. *Id.* Genuine issues of material fact exist as to what exactly occurred on February 14, 2012, and whether plaintiff suffered an injury on that date. Accordingly, defendant Lincoln's motion for summary judgment should be denied with respect to this claim.

**4. March 15, 2012**

Plaintiff alleged that on March 15, 2012, during the course of a cell search, defendant Lincoln "put his hands between Plaintiff's thighs, grabbed his genitals in a 'sexually aggressive' manner, and squeezed them, causing severe pain." Opinion at PageID.146. Plaintiff

suggests that this lasted up to 15 minutes. *Id*. Defendants do not address this incident, which would appear to be an Eighth Amendment claim. As discussed, defendants did not respond to a related claim against Inspector Dusenbery, *i.e.*, that Dusenbery refused to process plaintiff's "emergency" grievance related to March 15, 2012 incident. For his part, plaintiff provided a declaration from another prisoner, W. Hull, who stated that he saw CO Lincoln "reach his hand between prisoner Hunter's legs from the back and grab Hunter's genitals" and called plaintiff a "little bitch" among other things. Hull Decl. (ECF No. 140-1, PageID.822). Hull also stated that plaintiff "looked like he was in severe pain." *Id*. Genuine issues of material fact exist as to what exactly occurred on March 15, 2012, and whether plaintiff suffered an injury on that date. Accordingly, plaintiff's case should proceed against defendant Lincoln with respect to this claim.

**F. RUS Gilkie**

On initial screening, the Court did not develop the contours of plaintiff's claim against defendant Gilkie related to the alleged assaults other than stating that:

> Plaintiff alleges that he told Gilkie about Lincoln's harassing behavior, and Gilkie did nothing about it. Later, Lincoln assaulted Plaintiff. These allegations are sufficient to state an Eighth Amendment claim against Defendant Gilkie.

Opinion at PageID.157.

**1. February 12, 2012 incident**

In his motion for summary judgment, Gilkie argues: that plaintiff alleged that he notified Gilkie of his February 12, 2012 interaction with Lincoln; that "[p]laintiff claims that Gilkie advised him to file a grievance against Lincoln"; that "[p]laintiff now sues Gilkie alleging only that he didn't get involved"; and, that "[p]laintiff has failed to allege any personal involvement on the part of Gilkie in the complained of conduct from February 12, 2012." Defendants' Brief at PageID.703. Based on this record, plaintiff has not alleged any misconduct against defendant

Gilkie. Rather, plaintiff filed a grievance against Lincoln on February 12, 2012 (Grievance 179) as GIlkie suggested. As discussed, Sgt. Ryske responded to the grievance and Deputy Warden Meagher reviewed the response. *See* Grievance 179 at PageID.750. Plaintiff has not demonstrated unconstitutional conduct on the part of Gilkie. *See Shehee*, 199 F.3d at 300 ("liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act"). Accordingly, defendant Gilkie should be granted summary judgment on this claim.

**2. March 19, 2012**

Plaintiff alleged that on March 19, 2012, Gilkie summoned plaintiff to his office and confronted plaintiff about the "emergency" grievance filed against Lincoln related to the March 15, 2012 incident and refused to process it. Opinion at PageID.146; Compl. at PageID.24-25. Gilkie does not address this claim. Accordingly, this claim should proceed to trial.

**E. Plaintiff's claim that CO Smith stalked him**

On initial screening, the Court concluded that,

> According to Plaintiff, Officer Lincoln physically harassed him on several occasions, ostensibly in retaliation for Plaintiff's grievances. Officer Smith participated in one of those incidents by summoning Plaintiff out of his cell to be harassed by Officer Lincoln. The Court concludes that these allegations state a claim under § 1983 against Defendants Lincoln and Smith.

Opinion at PageID.158. Specifically, plaintiff alleged that February 27, 2012, at about 7:15 p.m.: "Defendant Smith immediately began stalking Plaintiff;" "followed Plaintiff back to his housing unit and at approximately 09:25 p.m., Smith unlocked Plaintiff's cell/room door, kicked the door open, then approached Plaintiff in a threatening and intimidating manner, and forcibly took charge of his personal television." Compl. at PageID.20-21. Plaintiff filed Grievance 244 on February 28, 2012. *Id.* at PageID.21; Grievance 244 (ECF No. 134-2, PageID.756-757).

Sgt. Rykse performed interviews and an investigation related to the grievance stating in the response: that plaintiff would not agree to talk about the grievance; that Officer Smith stated that "he didn't work B-unit and was never issued B-unit keys on the day that prisoner [H]unter claims this happened;" that "[u]pon checking the B-units log book Officer Smith was never assigned nor issued any unit keys, which he would have needed to open prisoner Hunter's cell door," and concluded that "Prisoner Hunter in [sic] abusing the grievance process by writing false statement against staff in attempts to harass them and get them disciplined which violates PD 03.02.130 section L and this grievance should be denied at step 1." Grievance 244 at PageID.757. There is no factual basis to support plaintiff's claim against defendant Smith. Accordingly, defendant Smith should be granted summary judgment and dismissed from this case.

**F. Qualified Immunity**

Defendants set forth the legal standard for qualified immunity, but do not develop their claim. Rather, defendants simply conclude that "For the reasons stated in the arguments set forth above, Defendants are entitled to qualified immunity because Plaintiff has not demonstrated that any Defendant violated any clearly established constitutional or statutory right." Defendants' Brief at PageID.708. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).[3] Accordingly, the Court deems this argument waived.

[3] The Court notes that defendants' brief includes an errant paragraph at PageID.706 referring to a claim of qualified immunity for two individuals who are not parties to this litigation:

**III. State law claims**

Plaintiff has alleged state law claims against defendants Meagher, Rykse, Thoma, Barnett and Smith. *See* Compl. at PageID.33-34. The Court exercised its supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims appeared to be related to the alleged federal violations. *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy"). The undersigned has concluded that defendants Meagher, Rykse, Thoma, Barnett and Smith should be granted summary judgment as to plaintiff's federal claims. For this reason plaintiff's state law claims alleged against these defendants should be dismissed pursuant to 28 U.S.C. § 1367.

The dismissal of plaintiff's federal claims requires the Court to re-examine the issue of supplemental jurisdiction for the state law claims alleged in the complaint. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." "Supplemental jurisdiction 'is a doctrine of discretion, not of plaintiff's right.'" *Habich v. City of Dearborn*, 331 F.3d 524, 534 (6th Cir. 2003), quoting *Baer v. R & F Coal Co.*, 782 F.2d 600, 603 (6th Cir. 1986) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255

---

Plaintiff has no proof that Bevington and Palmer were involved in the ultimate disposition or writing of the misconduct ticket in any active role. As they were not personally involved, claims against them must be dismissed as they are entitled to qualified immunity.

(6th Cir. 1996). If the Court accepts the recommendation to dismiss the federal claims alleged against defendants Meagher, Rykse, Thoma, Barnett and Smith, then there is no reason to retain supplemental jurisdiction over plaintiff's state law claims.

**IV. Recommendation**

For these reasons,

I respectfully recommend that defendants' Motion for summary judgment (ECF No. 133) be **GRANTED** in part and **DENIED** in part as follows:

**A.** The motion should be **GRANTED** as to defendants Meagher, Rykse, Thoma, Barnett, and Smith.

**B.** The motion should be **GRANTED** as to defendant Dusenbery with respect to the February 14th incident. Because the motion for summary judgment did not address plaintiff's claim that Dusenbery refused to process his "emergency" grievance related to the March 15th incident, that claim should proceed to trial.

**C.** The motion should be **GRANTED** as to defendant Gilkie with respect to the claims related to plaintiff's typewriter and the incidents which occurred on February 12th. Because the motion for summary judgment did not address plaintiff's claim related to Gilkie's refusal to process a grievance on March 19th, that claim should proceed to trial.

**D.** The motion should be **GRANTED** as to defendant Lincoln with respect to incidents which occurred on February 6th and February 12th, and **DENIED** with respect to the incident which occurred on February 14th. Because the motion for summary judgment did not address plaintiff's claim related to March 15th incident, that claim should proceed to trial.

I further recommend that the state law claims against defendants Meagher, Rykse, Thoma, Barnett and Smith be **DISMISSED** pursuant to 28 U.S.C. § 1367.

I further recommend that defendants Meagher, Rykse, Thoma, Barnett and Smith be **DISMISSED** from this case.

I further recommend that this case proceed to trial with the following claims: (1) defendant Dusenbery refused to process plaintiff's "emergency" grievance related to the March 15th incident; (2) defendant Lincoln assaulted plaintiff on February 14th; (3) defendant Lincoln assaulted plaintiff on March 15th; and, (4) defendant Gilkie refused to process plaintiff's "emergency" grievance on March 19th.

Dated: March 6, 2020

/s/ Ray Kent
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).